McKESSON & ROBBINS v. EDWARDS et al.

District Court, S. D. New York.

Feb. 13, 1936.

110

Donald Horne, of New York City, and Frederic Wingersky, of Boston, Mass., for plaintiff.

Martin Conboy, U. S. Atty., of New York City (Leon Spencer, Asst. U. S. Atty., of New York City, of counsel), for defendants.

BRYANT, District Judge.

Plaintiff seeks to recover income and profit taxes assessed and collected for 1918, claiming that said taxes were excessive and overpaid. The amount asked is $138,221.-47. The alleged grounds for recovery are: (1) Failure to take a deduction from gross income for amortization of war facilities; (2) inadequate calculation of invested capital.

For 1918 plaintiff paid income and profits tax of $178,811.17; the last payment being made in December, 1919. There was an overpayment of about $850, which amount was credited against the taxes due in 1919. No additional tax was ever assessed.

At the close of plaintiff's case and at the close of the whole case, defendant moved to dismiss on the ground the court did not have jurisdiction of the subject-matter because (1) the claim of deduction for amortization of war facilities was not filed in time; (2) the claim for refund was not timely filed; and (3) the action was not commenced in time. Decision thereon was reserved.

The motions are denied. The objections were before the Circuit Court of Appeals. The court has stated the law of the case [McKesson & Robbins, Inc., v. Edwards, 57 F.(2d) 147] subject to proof of the facts stated in the affidavits used on appeal. The proof and stipulations substantiate the facts in the affidavits used. I therefore take the decision cited as the law of the case and hold that the court has jurisdiction of the subject-matter of the action.

At the close of the case, both sides moved for direction of verdict. Decision thereon was reserved awaiting filing of briefs. Verdict in favor of defendant for dismissal of complaint, with costs, is directed.

Plaintiff is an old, well-established dealer in pharmaceuticals. In 1916 it had a manufacturing plant on Fulton street in the city of New York. The building was old and had become unsuitable and inadequate for manufacturing purposes. Plaintiff needed a new plant in order to care for its growing business and to compete for new business. In August, 1916, about eight months prior to our entry into war, it contracted for the erection of a modern plant at 55 Berry street, Brooklyn, N. Y. The contract called for the completion by February 1, 1917, and provided for a bonus if completed before that date and for a penalty for each day's delay thereafter. The building was not completed on time. However, it was, with the exception of machinery and equipment, substantially completed prior to April 6, 1917. This is borne out by testimony showing that approximately 99½ per cent. of the labor was performed prior to April 6, 1917. Manifestly, a large portion of the work connected with the plumbing, heating, elevators, lighting, sprinkler system, and installation of machinery had been done prior to April 6, 1917. This is borne out by the fact that on April 10th electric current was turned on; on April 11th steam was up in the boiler, the sprinkler system was partly installed and the plumbing work was sufficiently completed to allow the water to be turned on; on April 23d the elevators were started; and on April 16th plaintiff began to move into the plant. The total cost of the plant was $290,626.47. Of this amount, $162,772.50 was paid subsequent to April 6, 1917. The record does not disclose what proportion of this amount was for material furnished and work performed prior to April 6th, and, of course, the converse is true.

When the plant, built and equipped to provide a modern factory to meet the plaintiff's expanding business, was practically completed, the United States entered the war. The facts are such as to warrant the conclusion that the United States' entry in the war had no effect upon the completion of the building.

Naturally, plaintiff, being a dealer and manufacturer of articles used by armies, after our entry in the war, began to compete actively for government orders. The orders were received through competitive bids and were irregular in times and amounts. For a considerable period sales to the government represented about one-half of the value of plaintiff's output.

Government orders did not cease with the signing of the Armistice, as happened in war industries, but continued practically undiminished well into the year 1920. In fact, 1919 was the banner year for output. In the latter part of 1920 government orders dropped to a peace-time level, but this does not seem to have been the cause for the shutdown of the manufacture of pharmaceuticals. Plaintiff operated a part of its business under the name of New York Quinine Division. This branch manufactured heavy chemicals largely, and was housed and operated in a separate building. Its business was profitable. Its products were sold to manufacturers of pharmaceuticals. These customers objected to purchasing from a concern which had a factory across the way (55 Berry street) manufacturing in competition. Plaintiff had to choose, and it kept the heavy chemical business and limited its manufacturing at 55 Berry street to a line of proprietary products.

It is apparent that the building (55 Berry street) was not erected or equipped for the purpose of producing war articles. The fact that the owner did, after its erection, manufacture articles upon government orders, does not bring the case within the purview of the statute providing for amortization.

There are no facts in the case upon which a claim for obsolescence could be based. It must be borne in mind that "obsolescence" and "amortization" are not synonymous words. The fact that 1919 was the year of the greatest output proves that an obsolescence claim for 1918 on a new building and on new machinery is not well founded.

The only other contention put forth by plaintiff is that it is entitled to refund because of error in statement of invested capital and error in computation of prewar capital.

Plaintiff filed its income tax return setting forth its invested capital. The Commissioner of Internal Revenue did not decrease it; rather he slightly increased it. In 1925 plaintiff filed claim for refund; one ground being that it was entitled to restoration of invested capital. No facts were given in support of the allegation. Inasmuch as no deduction had been made, the allegation was meaningless. Standing alone, the claim for refund as regards invested capital was insufficient. However, it is contended that this defect was cured

by the letter, or brief, dated January 12, 1926, which plaintiff claims to have sent to the Commissioner. The Commissioner claims he never received it. It is not necessary to pass upon the controversy of the effect of nonreceipt. The letter or brief as an amendment is insufficient. Paragraph 3 is the only part pertinent to the issues presented at the trial. That paragraph does not state facts that would have enabled the Commissioner, had he received the letter, to have passed upon the merits of the claims tried. The regulations in force at that time required the taxpayer to state in the claim for refund, or any amendments thereto, all pertinent facts necessary to enable the Commissioner to act. This is a prerequisite to taxpayer's right to sue. In the present case, it cannot be claimed the Commissioner waived any defects, for he never received the alleged amendment.

The specific claims of error in connection with capital are:

 Plaintiff contends that, when McKesson & Robbins, Inc., was formed January 1, 1917, and took over the assets and liabilities of the McKesson & Robbins partnership, it did not adequately capitalize "good will." It placed the "good will" figure at $500,000, which figure was based upon the statement of one of the partners that for the past five years the profits, after deducting 6 per cent. on capital employed and reasonable salaries for partners, had averaged better than $175,000 per year. Plaintiff claims this to be wrong, in that the average profit was $378,123.26 instead of $175,000. The books were not available. The larger figures were taken from trial balance sheets for those years. It is the contention of the government that the trial balance figures represent the net income before deduction of salaries of partners. I believe this interpretation correct. So considered, the figures become more nearly reconciled with the figures given by McKesson, a partner in the old firm and president of the new firm. Under this interpretation, it can hardly be said that $500,000 is grossly inadequate as an amount for "good will."

Plaintiff contends it has the right to capitalize, for tax purposes, the good will of New York Quinine & Chemical Works, Limited, the amount to be obtained from prewar profit figures. This corporation was not taken over by McKesson & Robbins, Inc. It was dissolved. McKesson & Robbins, Inc., took over the assets and liabilities at book value. I do not understand it to be accepted accounting practice to capitalize good will on purchase of assets only. The company, whose good will is sought to be capitalized, had ceased to exist.

The inclusion of the $500,000 good will item in the computation of the prewar capital seems to be in accord with section 330 of the Revenue Act of 1918 (40 Stat. 1094) and article 934 of Regulations 45.

Plaintiff contends it was error to include in prewar invested capital the New York Quinine Stock at $294,000; that it should have been carried at the actual cost to the partnership. I fail to find error in this. The record shows that McKesson & Robbins partnership prior to incorporation increased its book value by changing its carrying charge of the stock from actual cost to par value. This increase should be reflected in prewar invested capital.

I will repeat that the claim for refund and the alleged amendment thereto were insufficient to enable the Commissioner, had he received the alleged amendment, to pass upon the four alleged errors in statement of invested capital and prewar invested capital.